UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

MARISSA WILLIAMS,

                                        Plaintiff,

                  -v-

FREDERICK SAVORY, et al.,

                                     Defendants.

------------------------------------------------------------------------X

13 Civ. 2013 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/7/2015

PAUL A. ENGELMAYER, District Judge:

In 2009, plaintiff Marissa Williams' two daughters were removed from her custody on an emergency basis by employees of the New York City Administration for Children's Services ("ACS"), the city agency responsible for child welfare. In 2013, after Williams had regained custody of one daughter, that daughter was again removed from her custody after Williams allegedly struck her multiple times with a belt buckle.

Proceeding *pro se* and *in forma pauperis*, Williams now brings this action against 14 defendants pursuant to 42 U.S.C. § 1983, alleging a host of federal and state constitutional violations arising out of their roles in the 2009 and 2013 removals of her daughters and in later Family Court proceedings. The defendants are the City of New York ("the City"); the New York Police Department ("NYPD"); ACS's Commissioners in 2009 (John Mattingly) and 2013 (Ronald Richter); ACS's chiefs of staff in 2009 (Jessica Hu) and 2013 (Liz Lauros); three ACS caseworkers (Frederick Savory, Katrina Jordan, and Racquel Ellis); the caseworkers' supervisors (Zeena Ally, Heather Awer, and Yesenia Del Valle); and two Special Assistant Corporation

Counsels for the City of New York who represented ACS in Bronx Family Court proceedings against Williams (Latoya Stephens and Kenneth Sokol).

Defendants now move for summary judgment as to all claims. For the reasons that follow, the Court grants defendants' motion in its entirety.

## I.    Background[1]

### A.    The Parties

In 2009, Williams lived in the Bronx with her daughters, I.W. and Y.J.[2] Dkt. 2 ("Compl."), ¶¶ 4–5, 31–32. Williams had lived with each daughter since her birth. *Id.* at ¶ 6. As of October 2009, I.W. was age nine; Y.J. was six. *Id.* at ¶¶ 31–32. I.W.'s father is Percy Robinson; Y.J.'s is Gregory Johnson. *Id.* at ¶¶ 32, 45; *see also* Defendants' Local Rule 56.1 Statement of Material Facts ("Defs' 56.1"), ¶¶ 3–4. Neither Robinson nor Johnson, nor anyone

---

[1] The Court's account of the background is drawn from the parties' submissions, including Williams' Complaint (Dkt. 2); Defendants' Local Rule 56.1 Statement of Material Facts (Dkt. 57); the Declaration of Zeena Ally (Dkt. 50); the Declaration of Heather Awer (Dkt. 51) and attached exhibits; the Declaration of Racquel Ellis (Dkt. 52) and attached exhibits; the Declaration of Karyn Boutis (Dkt. 53) and attached exhibits; the Declaration of Arlene Rivera (Dkt. 54) and attached exhibits; the Declaration of Katrina Jordan (Dkt. 55) and attached exhibits; the Declaration of Carolyn Kruk (Dkt. 56) and attached exhibits, which include the deposition of Williams; and Williams' affidavit in opposition to summary judgment (Dkt. 61).

Although Williams filed a Complaint and an affidavit, she did not dispute (or even mention) the vast majority of the factual propositions on which defendants rely in moving for summary judgment. The Court takes as true the factual propositions propounded by defendants which are supported by admissible evidence and which Williams does not contravene, for this rule of law applies equally to cases involving *pro se* plaintiffs. *See* Fed. R. Civ. P. 56; Local Civil Rule 56; *see also Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (citing, *inter alia*, *Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000)); *Pooler v. Hempstead Police Dep't*, 897 F. Supp. 2d 12, 17 n.7 (E.D.N.Y. 2012). Of course, in drawing inferences from the facts, the Court draws all inferences in favor of the non-movant and gives special solicitude to a *pro se* plaintiff. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).

[2] Because the daughters are minors, the Court, like the parties, refers to them by their initials.

else, lived with Williams and her daughters in 2009; the household contained three dogs.  *See* Compl. ¶¶ 32–33; Dkt. 61 ("Pl. Aff."), ¶ 2.

Of the 12 individual defendants: the three ACS caseworkers (Savory, Jordan, and Ellis) at different times investigated Williams' care of her children and made recommendations about it; their three supervisors (Ally, Awer, and Del Valle) conferred with the ACS caseworkers as to appropriate action; four others (Mattingly, Richter, Hu, and Lauros) were, as noted, current or former high-ranking officials at ACS; and two others (Stephens and Sokol) are City attorneys who represented ACS in Bronx Family Court proceedings against Williams.  The institutional defendants are the NYPD and the City.  The NYPD is sued based on the 2009 forcible entry by NYPD officers into Williams' home to give ACS caseworkers access to her daughters and on the 2013 arrest by an NYPD officer of Williams on charges that were later dropped.  The City is sued based on ACS's investigation and recommendation that Williams' daughters be removed.

**B.    The 2009 Removals and Aftermath**[3]

**1.    The Events Surrounding the October 2009 Removal**

On October 14, 2009, a report was called into the State Central Register alleging that a "[c]hild Y[.J.], age 6, has not been to school in a month because [her] mother does not feel like taking her.  Unknown what effect this is having on the child.  There is little or no food in the home, resulting in the children being hungry and asking for food."  Dkt. 52 ("Ellis Declaration"), Ex. A, CNY 34.[4]  The same day, these allegations were forwarded to ACS, which is responsible

---

[3] As explained below, Williams' claims based on events in 2009 and early 2010 are time-barred. The Court summarizes these events here as context for later events and for Williams' allegations.

[4] Williams alleges that this call came from "a disgruntled girlfriend of [her] ex-beau, Percy Robinson," who is I.W.'s father.  Compl. ¶ 32.

for investigating allegations of child neglect and abuse in New York City; the case was referred to ACS's Bronx field office, and was assigned to the Child Protective Services (CPS) unit, and specifically to caseworker Jordan for investigation. Defs' 56.1 ¶¶ 6–8. On October 15, 2009, Jordan met with her supervisor, Ally, to discuss the case and her investigation. *Id.* at ¶ 8.

At 6 p.m. on October 15, 2009, Jordan conducted an unannounced visit at Williams' home. *Id.* at ¶ 9. Jordan knocked and rang the doorbell; there was no answer. *Id.* Through the window, Jordan saw two dogs inside. *Id.* Jordan wrote a Notice of Visit and then saw a woman walking towards the home with a dog. *Id.* at ¶ 10; Compl. ¶ 33. Jordan asked the woman if she was Williams; Williams said yes. Defs' 56.1 ¶ 10. Jordan explained to Williams that ACS had concerns that her children were not attending school regularly, and asked where the children were. *Id.* Williams replied that the children were in the house. *Id.* Jordan said that Williams should not leave her children at home alone. *Id.* Williams responded that her children were mature enough to be home alone. *Id.* Jordan asked about Y.J.'s attendance at school; Williams replied that Y.J. had not been in school for approximately two weeks because she was ill. *Id.* at ¶ 11. Jordan asked Williams whether she had sought medical attention for Y.J.; Williams said that she had and would look for documentation. *Id.* at ¶ 12.

Jordan entered the home with Williams' permission and interviewed the children. Compl. ¶ 34. According to Jordan, both daughters stated that their mother sometimes left them home alone. Defs' 56.1 ¶¶ 17–18. The older daughter, I.W., also said that Y.J. had not attended school for two weeks, not because she was ill, but because Williams thought it was too cold outside. *Id.* at ¶ 17. Y.J. similarly told Jordan that she had not been sick, and that the reason she had not been attending school was that Williams felt it was too cold outside. *Id.* at ¶ 18. Y.J. also told Jordan that Williams smoked sometimes, but that Y.J. did not know what her mother was smoking. *Id.*

In the ensuing days, Jordan conducted additional interviews, including of I.W.'s principal and I.W.'s father. *Id.* at ¶¶ 22–23. The principal reported that I.W.'s school attendance had been poor; she had been absent during the 2008–09 school year on approximately 30 occasions. *Id.* at ¶ 23. To avoid having to repeat the third grade, I.W. had had to attend summer school. *Id.*

On October 22, 2009 at 6:45 p.m., Jordan conducted another unannounced home visit. *Id.* at ¶ 28. Jordan told Williams that ACS had several concerns that it wanted to address with her at a child safety conference. *Id.* at ¶ 29. Jordan again interviewed the children. I.W. told Jordan that Williams had left her and Y.J. home alone more than once. *Id.* at ¶ 35. I.W. also told Jordan that her mother smoked, but because she smoked in the bathroom with the door closed, I.W. did not know what Williams smoked. *Id.* Y.J. told Jordan that once when she was left alone, she cooked soup on the stove and that Williams knew this. *Id.* at ¶ 37. For her part, Williams told Jordan that she left her children home alone while she went to the store or walked her dogs, and that she knew that I.W. sometimes cooked on the stove; she denied that Y.J., the younger daughter, did so. *Id.* at ¶ 38. Jordan asked Williams to come to ACS's field office for a child safety conference to discuss the agency's concerns, Compl. ¶ 36; Jordan provided Williams the date, time, and location of the conference, *id.* at ¶ 38.

On October 27, 2009, the conference occurred; Williams did not attend, and attests that she had told Jordan all along that she would not attend. Defs' 56.1 ¶¶ 43–44; Compl. ¶ 37. Participants included Jordan; ACS CPS Manager Tammy Moore; Child and Family Specialist Facilitator Bolzia Jacobs; and I.W.'s father, Robinson. Defs' 56.1 ¶ 44. The participants discussed the children's attendance problems, Williams' alleged smoking, Williams' having left her children home alone, and the children's use of the stove. *Id.* at ¶¶ 44–46. I.W.'s father, Robinson, agreed to take both children if removed from Williams. *Id.* at ¶ 48. The participants

5

decided to remove the children from Williams' home and file an Article 10 petition seeking Y.J.'s remand and I.W.'s parole to I.W.'s father, Robinson. *Id.* at ¶ 49. That evening, Jordan removed Y.J. from Williams' home and brought her to Robinson's home where I.W. was already staying that night. *Id.* at ¶ 50. Jordan did not have a court order to take such action. Compl. ¶ 41.

The next morning, Stephens, ACS's counsel, filed two Article 10 petitions, verified by Jordan, alleging that I.W. and Y.J. were neglected children. *See* Dkt. 55 ("Jordan Decl."), Exs. E, F. The petitions alleged that Williams failed to provide her children with (1) adequate education, and (2) proper supervision or guardianship. *Id.* On October 28, 2009, a hearing was held before Bronx Family Court Judge Sidney Gribetz. Jordan Decl. Ex. G. Williams attended and was represented by an attorney from the Bronx Defenders. *Id.* Stephens told the Court that the two children had been removed from Williams' custody on an emergency basis the day before; she asked that the children be paroled to Robinson. *Id.* The Court granted ACS's petition and scheduled the next conference for November 5, 2009, before Bronx Family Court Judge Gayle Roberts. *Id.*

At the November 5, 2009 conference, Judge Roberts ordered Williams to undergo a mental health evaluation. *Id.* Ex H. After this evaluation did not note any concerns, Judge Roberts found that ACS's concerns were only suspicions and returned the children to Williams' custody, under ACS supervision. *Id.* The Court advised Williams that "ACS supervision" meant that, among other things, "caseworkers can make announced and unannounced visits to your home." *Id.* The next court hearing was scheduled for December 18, 2009. On November 20, 2009, Robinson and Johnson filed for custody of their respective daughters, *see* Dkt. 56 ("Kruk Decl."), Ex. A; on December 8, 2009, Williams filed for custody of I.W. only, *id.* Ex. B.

### 2.      The Events Surrounding the December 2009 Removal

On December 17, 2009, at 4:17 p.m.—the day before the next court conference—Jordan

went to Williams' home to conduct an unannounced visit.  Defs' 56.1 ¶ 66.  Jordan knocked on

the apartment door but received no answer; she left a Notice of Visit asking Williams to contact

Jordan immediately.  *Id.* at ¶ 67.  At 5:01 p.m., Jordan returned to the home.  *Id.* at ¶ 68.  Upon

arriving, Jordan saw through the apartment window what appeared to be a child standing in front

of the window.  *Id.*  Jordan knocked on the door; no one answered.  *Id.*  Jordan saw through the

window a child in a white shirt across the living room.  *Id.*  Jordan knocked harder and received

no answer.  *Id.*  Jordan called Williams' cell phone, which went to voicemail; Jordan left a

message explaining that she was in front of Williams' home attempting to conduct a home visit.

*Id.*  Williams promptly returned Jordan's call and told Jordan she was not home.  *Id.* at ¶ 69.

When Jordan stated that she could see a child through the window, Williams responded that her

children were home with a babysitter.  *Id.*  Jordan asked Williams to call the babysitter to let her

into the apartment; Williams said she would.  *Id.*  At 5:12 p.m., Williams called Jordan back and

said that the babysitter had left the home with the children.  *Id.* at ¶ 70.  Jordan said that she had

seen a child in the house and had not seen anyone leave since she had arrived.  *Id.*  Jordan asked

Williams if the children were home alone; Williams allegedly said "of course not" and hung up

the phone.  *Id.*

Jordan knocked on the door again and heard the volume of the music playing in the home

go up.  *Id.* at ¶ 71.  Jordan called Williams' phone again; this time, she received no answer.  *Id.*

Jordan called her supervisor, Ally, and explained her concerns that the children may be home

alone.  *Id.* at ¶ 72.  Ally told Jordan to call the police to gain entry into the home.  *Id.*  Jordan

then called 911, seeking the NYPD's assistance.  *Id.* at ¶ 73.  At approximately 6:30 p.m., Jordan

observed the lights in Williams' home flickering on and off, and heard the volume of music fluctuating. *Id.* at ¶ 74. Jordan continued to see the children through the window, and continued to call Williams' cell phone and to knock on her front door, both without response. *Id.*

At about 8 p.m., two NYPD officers, Edward Arjona and Ivanovic Gomez, arrived at the home. *Id.* at ¶ 75. The officers knocked on the door and yelled for the door to be opened, but no one answered. *Id.* The officers then began to bang on the door and the window of the home with their flashlights; still, no one answered. *Id.* The officers also called Williams on her cell phone and left a voicemail. *Id.* at ¶ 76. Jordan called Ally and said that Williams' children were seen through the window but that no one was answering the door. *Id.* at ¶ 77. Jordan told Ally that the officers also suspected that the children were home alone. *Id.* Ally asked that the police break down the door. *Id.* Jordan forwarded this request to the police officers, who contacted their lieutenant for authorization to use force to enter a home. *Id.* Around this time, after a call from Jordan, both children's fathers arrived at the home. *Id.* at ¶¶ 79–82. Two more NYPD police officers also arrived, Lieutenant Anand Bhoj and Officer Daniel Tonnessen. *Id.* at ¶ 80. The officers knocked on the front door and window. *Id.* No one responded. *Id.* The officers could hear the volume of music in the home going from low to high. *Id.* The officers said that they would need to call the NYPD's Emergency Services Unit ("ESU") to break down the door. *Id.* Jordan and an officer went to the apartment downstairs from Williams' and spoke with the tenants, who said they could hear footsteps coming from Williams' apartment. *Id.* at ¶ 83.

At about 8:48 p.m., members of the NYPD's ESU broke down Williams' door. *Id.* at ¶ 84. The officers attempted to open the door but noticed that it was barricaded by, among other things, a shopping cart filled with items. *Id.* Williams was found in the bedroom with her two children. *Id.* When asked why she had not opened the door, Williams stated that she had taken a

pill for her period, was asleep, and had not heard anything.  *Id.* at ¶¶ 84–85; Compl. ¶ 46.  Ally

decided that the children were at imminent risk and should be removed from Williams' custody

and placed in the care of their respective fathers.  Defs' 56.1 ¶ 86.  Williams objected to the

removal, stating there was no "imminent risk" to the children because Williams was home with

them.  *Id.* at ¶ 87.

The next day, at the scheduled court hearing, the court paroled Williams' children to their

respective fathers.  Jordan Decl. Ex. I, CNY 386.

### 3.   The Events of 2010 to Early 2013

In January and February 2010, Williams and Hu, an ACS chief of staff, exchanged

emails, in which Williams complained about the emergency removals of her children.  *See* Kruk

Decl. Ex. C (emails of Jan. 7, 2010; Feb 1, 2010; Feb 1, 2010; Feb. 4, 2010; Feb. 5, 2010; and

Feb. 5, 2010).

On April 15, 2010, the Bronx Family Court denied Williams' application for the return of

her children.  Kruk Decl. Ex. E, CNY 542.  The Court reasoned that each incident considered

separately might not pose an imminent risk to the children, but when considered together, they

indicated imminent risk to the children.  *Id.* at CNY 542–48.

On August 13, 2010, the Court issued a decision, finding that "[a] preponderance of the

evidence . . . establishes that both [I.W.] and [Y.J.] are neglected children in that their physical,

mental or emotional condition has been impaired or is in imminent danger of becoming impaired

as a result of the failure of Respondent Williams to supply the children with an adequate

education."  *Id.* Ex. H, 11.  However, the Court declined to enter a separate finding of inadequate

guardianship against Williams on the basis of imminent danger to the children.  *Id.* at 16.

On or about November 15, 2010, Williams moved the Bronx Family Court for an order returning Y.J. to her custody (from Johnson's). *Id.* Ex. I, CNY 942. On April 12, 2011, Judge Roberts denied the application, for the reasons she had previously given. *Id.* Ex. J.

On December 15, 2011, Robinson was awarded temporary custody of I.W.; Williams was granted visitation rights. *Id.* Ex. O. On August 24, 2012, however, the Court dismissed Robinson's petition for custody after he was sentenced to 10 years in prison. *Id.* Ex. P.

On November 8, 2012, Williams was awarded custody of I.W. without ACS supervision. *Id.* Ex. Q. The Court ordered that the children be given sibling visits at their grandmother's home once a month. *Id.* Ex. R.

On January 28, 2013, the Court issued a 20-page decision addressing both child neglect and custody. It noted that Williams had not testified during the fact-finding proceedings, filed petitions for custody of or visitation with Y.J., or offered any documents or other evidence. *Id.* Ex. S. The Court granted custody of Y.J. to her father with no further ACS supervision, finding that the "documentary evidence and witnesses' testimony makes it abundantly clear that [Y.J.'s father] is better suited to provide [Y.J.] with a stable home environment and provide for her physical, emotional and educational needs. It is in [Y.J.'s] best interests to remain in her father's custody." *See id.* at 20.

On March 13, 2013, Williams filed a Notice of Claim with the City Comptroller's Office. *Id.* Ex. X; Compl. ¶ 80. Williams criticized ACS employees for violating her rights by removing her children and separating her family without a court order or emergency. Kruk Decl. Ex. X. She also criticized the Bronx Family Court judge as being prejudiced and biased. *Id.*

### C.     The March 2013 Removal and Aftermath

On March 18, 2013, at 12:41 p.m., a report was called in to the State Central Register. Ellis Decl. Ex. A.  It stated that "on 3/17/13 mother [Williams] hit I[.W.] with a belt multiple times.  As a result, the child sustained a welt on her arm."  *Id.*  It added that the child, I.W., had disclosed the incident.  *Id.*

That afternoon, ACS caseworker Ellis was assigned the case.  Defs' 56.1 ¶ 132.  Ellis contacted the report's source, who stated that I.W. had come to school and told the principal that she needed to speak with her ACS caseworker.  *Id.* at ¶ 133.  I.W. apparently did not want to say why, but she was willing to write it down.  *Id.*  According to the source, I.W. had written that her mother (Williams) had hit her with a belt multiple times for no reason.  *Id.*  The source said that ACS caseworker Savory was called; when I.W. spoke to Savory, I.W. started to cry.  *Id.*  Savory then told the source to report the incident to the State Central Register.  *Id.*  Ellis then called Williams and informed her that a report had been made concerning I.W.'s safety; Ellis stated that she needed to see I.W. that evening.  *Id.* at ¶ 135.  Williams gave her home address to Ellis.  *Id.*

At about 7:50 p.m. that night, Ellis arrived at Williams' home.  *Id.* at ¶ 136.  Ellis explained that a report had been made regarding I.W.'s safety.  *Id.*  Williams stated that the report had come about because I.W. had gone to the school nurse to get a band-aid, and the school decided to call in a report.  *Id.*  Williams told I.W. to tell Ellis what I.W. had told Williams; I.W. then told Ellis that she went to get a band-aid from the nurse for a cut on her hand, and she had no idea what happened after that.  *Id.*  In her declaration, Ellis said, "I.W. gestured to me—out of sight of Ms. Williams—in a manner that I interpreted to mean that she did not want me to say anything about . . . what she revealed to the source.  I then asked Ms. Williams if I could see the bedroom.  Ms. Williams allowed I.W. to show me the bedroom.

11

When we were alone, I asked I.W. if she was okay.  I.W. told me she was fine but did not want

to speak in the home because she was concerned that I was going to tell her mother that she was

the source of the report."  Ellis Decl. ¶ 12; *see also id.* Ex. B, CNY 200.

The following morning, Ellis went to I.W.'s school and spoke with I.W. about the alleged

incident.  Ellis Decl. ¶ 13.  According to Ellis, I.W. said that, on March 17, 2013, her mother,

Williams, had beaten her with a belt for holding a Blackberry device.  *Id.* at ¶ 14.  Ellis reported:

> I.W. told me that [] the beating started because her mother told her that she
> could not use the Blackberry.  But then her mother told I.W. to get up and go into
> the bedroom, so I.W. took her blanket along with the Blackberry and headed to
> the bedroom.  I.W. told me that her mother had given her the Blackberry so I.W.
> was surprised and shocked when her mother started hitting her with the buckle of
> the belt.
> I.W. told me that when the belt broke, Ms. Williams went and got another
> and continued to beat I.W.
> I.W. told me that she received the welt marks on her arms when she tried to
> protect her legs from the beating of the belt.
> I.W. told me that after the beating, I.W. found it hard to walk.
> I observed and photographed I.W.'s physical injuries.  I observed welt
> marks in the healing phase on both of I.W.'s arms that were about three inches in
> length.  I also observed lacerations on I.W.'s legs and thighs that were also in the
> healing phase that appeared to be from the buckle of the belts, consistent with
> I.W.'s explanation.  The edges of the lacerations on I.W.'s legs and thighs were
> jagged and consistent with being caused by a belt buckle.
> I asked I.W. if this was the first time that she had been hit by her mother.  I
> learned that this was not the first time that I.W. had been hit by her mother but
> that it was the first time that it was this severe, which is why I.W. became scared
> and why she asked the school to call her former ACS caseworker, Frederick
> Savory.
> I called my supervisor, Ms. Awer and told her about my conversation with
> I.W., as detailed above.  I also emailed Ms. Awer the photographs of I.W.'s
> injuries.

Ellis Decl. ¶¶ 15–21 (citations omitted).

Ellis and her supervisor, Awer, decided that they needed to report the incident to the

police.  *Id.* at ¶ 21.  On the afternoon of March 19, 2013, Awer called Williams and asked her to

bring I.W. to the 47th Precinct in the Bronx.  Defs' 56.1 ¶ 147.  There, NYPD Officer Arlene

Rivera of the Domestic Victims Unit and Ellis jointly interviewed I.W.  *Id.* at ¶ 148.  Williams

was not present.  *Id.*  I.W. stated that, on March 17, 2013, she had been on a "no electronics"

punishment; she was in the living room watching television, and her mother told her that she

needed to go to the bedroom.  *Id.* at ¶ 149.  I.W. said that she stood up with the Blackberry phone

and her blanket; when Williams saw I.W. with the Blackberry, she asked I.W. what she was

doing with the phone.  *Id.*  I.W. stated that she did not understand why her mother had asked that

question because her mother herself had given I.W. the Blackberry earlier.  *Id.*  According to

I.W., Williams then grabbed a belt and started beating I.W. with the buckle.  *Id.*  When that belt

broke, Williams went and got another belt and continued to beat I.W.  *Id.*  Officer Rivera

examined I.W.'s injuries.  *Id.* at ¶ 150.  That afternoon, Williams was charged with Assault in the

Third Degree, Endangering the Welfare of a Child, and Harassment in the Second Degree.  *See*

Dkt. 54 ("Rivera Decl."), Ex. B.  (These charges, however, were dropped several months later.

*See* Kruk Decl. Ex. Z ("Pl. Dep."), at 88.)

Ellis called her supervisor, Awer, and informed her that Williams would be arrested.

Ellis also noted that I.W.'s comments had been consistent with I.W.'s earlier account, and that

I.W. had told Ellis that she did not want to return home with her mother.  Awer told Ellis that she

would seek authorization for I.W. to be removed on an emergency basis; Awer soon obtained

this authorization.  On March 19, 2013, at about 3 p.m., I.W. was temporarily removed from

Williams' custody on an emergency basis; after being examined by ACS's medical team, I.W.

was taken to the home of her paternal grandmother, Izora Pettway.  Defs' 56.1 ¶ 152–56.

The next morning, on March 20, 2013, ACS filed an Article 10 neglect petition in Bronx

Family Court alleging that Williams had inflicted excessive corporal punishment on I.W.  *Id.* at

¶ 157.  That day, a hearing was held in Bronx Family Court.  *Id.* at ¶ 158. Williams attended and

was appointed counsel from the Bronx Defenders.  *Id.*  At the hearing, Judge Pitchal held that

ACS had been excused from making reasonable efforts to avoid the removal of I.W., because it

would have been contrary to I.W.'s welfare and best interests to remain with Williams.  *Id.* at

¶ 160.  Judge Pitchal ordered I.W. remanded to ACS's custody pending further proceedings.  *Id.*

at ¶ 161.  Judge Pitchal explained that it would be contrary to I.W.'s welfare and best interests to

remain in Williams' home because Williams had "struck [I.W.] repeatedly with a belt causing

lacerations to the subject child's legs from the belt buckle and bruises on her arms from trying to

block the belt from hitting her."  Ellis Decl. Ex. G.  ACS requested and the Court ordered

supervised visits for Williams and I.W., to take place at a foster care agency, Abbott House.

Defs' 56.1 ¶ 163.  Williams' attorney requested a § 1028 hearing—a hearing to determine

whether a child should be returned to the custody of her parent or other legal guardian, *see* N.Y.

Fam. Ct. Act. § 1028.  Defs' 56.1 ¶ 162.  This hearing was scheduled for April 1, 2013.  *Id.*

On March 25, 2013, the City's Comptroller's Office received an amended Notice of

Claim from Williams, which claimed that Ellis had entered Williams' home without permission;

that Ellis, Awer, and a police officer had interrogated Williams' minor child and forced the child

to sign documents without a parent or lawyer present; and that Ellis and Awer had removed the

child without a court order and without cause.  *See* Kruk Decl. Ex. Y.

On October 3, 2013, the Bronx Family Court held a fact-finding hearing and issued a

fact-finding order.  It found, based on a preponderance of the evidence, that:

> [Williams] neglected [I.W.] by inflicting excessive corporal punishment upon her.
> The record indicates that the mother inflicted a severe beating on the child with
> the buckle of a belt; when the first belt broke, the mother obtained a second and
> continued to beat the child.  The child sustained lacerations on both legs and arms
> and was in such pain that she was unable to walk normally the next day and
> immediately cried out for assistance from school officials.  The child's out-of-
> court statements are corroborated by Ms. Ellis's eyewitness account of her

14

> injuries as well as the photographs of the injuries.  Finally, the child stated that
> she fears her mother; this statement is corroborated by her behavior on the day the
> investigator visited the home, when the child motioned to the worker not to ask
> certain questions.

Dkt. 53 ("Boutis Decl."), Ex. A.

On October 15, 2013, a permanency hearing was held before the Family Court.  Defs'

56.1 ¶ 169.  Before the hearing, the Court's "permanency planning goal" had been "Return to

Parent."  *Id.*  However, the Court noted, many unsuccessful attempts had been made to reach out

to Williams; the Court therefore ordered that a guardianship be planned for and that "KinGAP"

placement with I.W.'s paternal grandmother be explored.[5]  *Id.*  The Court also ordered Williams

to submit to a mental health evaluation, to comply with all treatment recommendations, and to

complete a parenting skills course.  *Id.* at ¶ 170.  In her deposition in this case, Williams

acknowledged that she did not comply with these orders, because: "from 2009 to 2012, we did

three mental health evaluations, parenting, family counseling, and I still didn't get my children

back; so, based on that unfair experience, I have no reason to think that another experience with

them would be any different."  Pl. Dep. 101.  She similarly explained that she never returned the

calls or letters of I.W.'s foster care agency, Abbott House, because "[i]t's clear . . . I'm not going

to get any fair treatment from them, so -- I would rather not deal with them."  *Id.* at 100.

On April 7, 2014, a permanency hearing was held as to I.W.  Defs' 56.1 ¶ 172.  Williams

did not appear; nor had she appeared at any such hearing since March 20, 2013, when she lost

custody of I.W.  *Id.* at ¶ 173.  In an affidavit in this case, Williams explained that she has not

attended hearings or made contact with ACS's staff because she "is being falsely accused, and

---

[5] KinGAP—the Kinship Guardianship Assistance Program—"is designed for a foster child to
achieve a permanent placement with a relative."  New York State Office of Children & Family
Servs., *Kinship*, *available at* ocfs.state.ny.us/kinship/kingap.asp (last visited January 7, 2015).

should have not have even been in court." Pl. Aff. ¶ 25.  At the April 7, 2014 hearing, the

Family Court changed the permanency planning goal from "Return to Parent" to "KinGAP."

Defs' 56.1 ¶ 176.

### D.      Procedural History

On March 25, 2013, Williams, *pro se*, filed a Complaint, pursuant to 42 U.S.C. § 1983.

She alleged that defendants had violated her federal and state constitutional rights in removing

her daughters from her home in 2009 and 2013 and for their later conduct.  Dkt. 2.

Following defendants' answer, *see* Dkt. 22, and discovery, the defendants, on May 28,

2014, moved for summary judgment, Dkt. 48, submitting a common memorandum of law, *see*

Dkt. 49, and Rule 56.1 Statement, *see* Dkt. 57, along with declarations in support, *see* Dkt. 50,

51, 52, 53, 54, 55, 56.  On July 7, 2013, Williams submitted an affidavit in opposition, Dkt. 61

("Pl. Aff."), and on July 21, 2013, defendants submitted a reply brief, Dkt. 62.

Defendants move for summary judgment as to all claims.  Most fundamentally, they

argue that a trier of fact could not find that they violated Williams' rights.  In particular, they

dispute her claim that her due process rights were violated by the removal of her children at

various points.  They argue that the facts support that Williams was afforded due process before

losing custody of her children.  Defendants also seek summary judgment, as to various claims,

based on absolute or qualified immunity and based on the statute of limitations.  For her part,

Williams disputes these points.

## II.      Legal Standards for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

When a *pro se* litigant is involved, the same standards for summary judgment apply, but "the *pro se* litigant should be given special latitude in responding to a summary judgment motion."  *Knowles v. N.Y. City Dep't of Corr.*, 904 F. Supp. 217, 220 (S.D.N.Y. 1995) (citation and internal quotation marks omitted); *see also Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.").

## III.    Discussion

In bringing claims under § 1983, Williams alleges violations of her rights under six provisions of the U.S. Constitution: the Fourth, Sixth, Eighth, and Thirteenth Amendments, and

two portions of the Fourteenth Amendment (its due process and equal protection clauses).  She

also alleges unspecified violations of the New York State Constitution.  Williams brings claims

against 14 defendants.  Given the number of claims and defendants, it is useful to address at the

outset certain claims where judgment for the defendants is clearly required as a matter of law, as

doing so significantly narrows the issues in dispute.  Specifically, the Court first addresses

Williams' claims (1) under the Sixth, Eighth, and Thirteenth Amendment claims, which do not

state a claim, (2) relating to the 2009 incident, which are time-barred, (3) against two ACS

attorneys, who are entitled to absolute immunity, and (4) against ACS Commissioners and

supervisors, because the Complaint does not allege facts, nor has discovery elicited evidence,

supporting a finding of supervisory liability.  The Court turns then to the remaining claims.

### A.      Preliminary Considerations

#### 1.      Williams' Sixth, Eighth, and Thirteenth Amendment Claims

The Complaint refers in passing to the Sixth Amendment.  *See* Compl., p. 10 (alleging

that defendants violated "Plaintiff['s] rights under the . . . Sixth . . . Amendment").  The

Complaint does not elaborate; the Court interprets Williams to refer to the episode alleged in the

Complaint in which I.W. was interviewed in a police station by an NYPD officer, with neither a

parent nor an attorney present, and despite Williams' alleged requests for a lawyer for her child.

*See* Compl. ¶¶ 81, 97.

The Sixth Amendment does not apply here.  It provides in pertinent part that "'[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for

his defence.'  The Amendment thus defines the scope of the right to counsel in three ways:  It

provides *who* may assert the right ('the accused'); *when* the right may be asserted ('[i]n all

criminal prosecutions'); and *what* the right guarantees ('the right . . . to have the Assistance of

Counsel for his defence').” *Rothgery v. Gillespie County*, 554 U.S. 191, 214 (2008) (Alito, J., concurring). Here, however, the relevant proceedings here were civil, not criminal, in nature, and Williams was never accused in those proceedings of a crime. *See People v. Roselle*, 84 N.Y.2d 350, 355 (1994) (“[T]he 'separate and civil' nature of an article 10 proceeding is indelibly clear from its provisions. One of the stated purposes of article 10 is 'to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being.' The orientation of Family Court is rehabilitative, directed at protecting the vulnerable child, as distinct from the penal nature of a criminal action which aims to assess blame for a wrongful act and punish the offender.” (citing *People v. Smith*, 62 N.Y.2d 306, 311 (1984); Family Ct. Act § 1011)). Summary judgment must therefore be entered for defendants on Williams' Sixth Amendment claim.[6]

As for Williams' Eighth Amendment claim, she alleges that defendants “are depriving the Plaintiff of her . . . right to be free from cruel and unusual punishment.” Compl., p. 1; *see* U.S. Const. amend. VIII (“Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.”). Williams contends that defendants violated this right by “unlawfully entering [her] home, repeatedly removing [her] children from her care without cause, and actively contributing to the multiple, prolonged, cruel, and unusual separations of this family.” Pl. Aff. ¶ 30. However, “the Eighth Amendment does not attach until after conviction

---

[6] To the extent that Williams bases this claim on the fact that her daughter was questioned without an attorney, Williams lacks standing to protest that practice, as a *pro se* plaintiff may generally only “proceed *pro se* with respect to [her] *own* claims or claims against [her] personally,” *Berrios v. N.Y. City Hous. Auth.*, 564 F.3d 130, 132–33 (2d Cir. 2009) (citing *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007)), even where minor children are involved, *see Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990); *accord Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998). Such a claim also fails because Williams' daughter was never the subject of a criminal case.

and sentencing, as 'it was designed to protect those convicted of crimes.'"  *Wims v. N.Y. City Police Dep't*, No. 10 Civ. 6128 (PKC), 2011 WL 2946369, at *5 (S.D.N.Y. July 20, 2011) (quoting *Ingraham v. Wright*, 430 U.S. 651, 664 (1977)); *see also Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989) ("[T]he Eighth Amendment's protections d[o] not attach until after conviction and sentence.").  Williams does not allege that she was convicted of or sentenced for a crime, let alone that the removal of her daughters from her home was a part of a punishment for such a crime.  Thus, the Eighth Amendment's protections do not apply, *see, e.g.*, *Graham*, 490 U.S. at 392 n.6, and summary judgment for the defendants is required on that claim.

Finally, as to the Thirteenth Amendment, it provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1.  "Shortly after its passage, the Supreme Court held that the Amendment 'is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.'"  *McGarry v. Pallito*, 687 F.3d 505, 510 (2d Cir. 2012) (quoting *Civil Rights Cases*, 109 U.S. 3, 20 (1883)).  The Thirteenth Amendment's protections "reach[] every race and every individual."  *Hodges v. United States*, 203 U.S. 1, 16 (1906), *overruled in part on other grounds*, *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 441 n.78 (1968).

Here, Williams alleges that ACS coerced her to attend a parenting course, *see* Compl. ¶ 28, and court hearings, and "forc[ed]" her to undergo drug testing, a mental health examination, and counseling sessions.  Pl. Aff. ¶ 31.  As a preliminary matter, Williams' own testimony was that the Family Court Judge, not defendants, ordered at least a number of the examinations.  *See* Pl. Dep. 56.  But in any event, Williams' complaints do not give rise to a

20

Thirteenth Amendment violation, because the conditions allegedly imposed by defendants do not

rise to the level of compulsory labor; she did not endure "a condition of servitude in which the

victim is forced to work for the defendant." *United States v. Kozminski*, 487 U.S. 931, 952

(1988). Thus, summary judgment for defendants is merited on Williams' Thirteenth Amendment

claim.

### 2.      The Statute of Limitations

"The statute of limitations for claims brought under Section 1983 is governed by state

law," and the relevant limitations period in New York is three years, pursuant to New York's

Civil Practice Law and Rules § 214. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir.

2009); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997). Williams did not file her

Complaint in this case until March 25, 2013, *see* Dkt. 2, which means that claims based on

events before March 25, 2010 are time-barred. Two events on which Williams heavily focuses

occurred in 2009: the first removal of Williams' daughters (on October 27, 2009), and the second

removal (on December 17, 2009), which also entailed involved a warrantless, forcible entry into

Williams' home by NYPD officers at the behest of ACS caseworkers. A number of Williams'

claims are based on these two events, including her claims that the entry into her home was

unlawful, and that the defendants "compelled [Williams] to submit to searches of her person and

home [and] compelled a court to separate child from . . . sibling." Compl. ¶ 2.

The decisive issue, then, is whether Williams' claims based on these incidents accrued at

the time of these incidents, or instead at some later point on or after March 25, 2010. Williams

argues that "August 13, 2010, the date of the Bronx Family Court decision, is the date that the

Statu[t]e of Limitation[s] for claims begins in this matter, for it was when the Plaintiff came to

know that her Constitutional protections were compromised in October and December

2009 . . . ."   Pl. Aff. ¶ 8.  That is incorrect.  "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the *harm*.'"  *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)) (emphasis added); *see also Wallace v. Kato*, 549 U.S. 384, 391 (2007) ("Under the traditional rule of accrual . . . the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages . . . even though the full extent of the injury is not then known or predictable.") (citation omitted).

Here, Williams experienced the removal of her children from her custody on the day it happened—she does not and cannot claim otherwise, and by her own admission, she attended Family Court proceedings the day after the removal.  Compl. ¶ 55.  In such circumstances, courts have held that the limitations period began to run on the date a parent's children were removed. *See, e.g.*, *Winkler v. Grant*, No. 07 Civ. 6280T (MAT), 2008 WL 1721758, at *3 (W.D.N.Y. Apr. 8, 2008) ("The three-year period begins on the date on which the plaintiff knew or had reason to know of the injury allegedly suffered.  In the instant case, plaintiff's cause of action for the unlawful removal of his children accrued on December 3, 2003, the date on which his children were taken.  Because the removal of his children took place more than three years before plaintiff filed his Complaint, plaintiff's cause of action based on that claim is time barred.") (citation omitted), *aff'd in part, vacated in part on other grounds*, 370 F. App'x 145 (2d Cir. 2010) (summary order); *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (affirming that suit was time-barred and continuing violation doctrine did not apply because "plaintiff was aware of the complained-of wrongful conduct"—the removal of his daughters from his custody—on the day they were removed, but failed to file suit within the 12-month period required by Tennessee law).

Williams does not appear to rely on the continuing violation doctrine, *see* Pl. Aff. ¶ 8, but the Court will consider such a theory out of solicitude for Williams as a *pro se* plaintiff. "The continuing violation doctrine is an exception to the normal knew-or-should-have-known accrual date." *Shomo*, 579 F.3d at 181 (citation and internal quotation marks omitted). The Supreme Court has applied the continuing violation doctrine, for example, in a hostile work environment case, reasoning that the "very nature" of such cases is that hostile work environments result from "repeated conduct" that "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). "[T]he continuing violation doctrine can be applied when the plaintiff's claim seeks redress for injuries resulting from 'a series of separate acts that collectively constitute one unlawful [act],' but the doctrine cannot be applied when the plaintiff challenges conduct that is a discrete unlawful act." *Shomo*, 579 F.3d at 181 (quoting *Morgan*, 536 U.S. at 118). The Second Circuit has also favorably cited Seventh Circuit case law that treats the continuing violation doctrine as applying in cases involving "a cumulative injury," not a continuing one. *Id.* at 181–82 (quoting *Heard v. Sheahan*, 253 F.3d 316, 320 (7th Cir. 2001)).

Williams' claims do not support application of the continuing violation doctrine. To be sure, Williams' loss of custody continued over time, compounding the pain to Williams from her children's absence, but their removal did not flow from a series of continuing wrongs. On the contrary, the acts giving rise to Williams' claim were complete when the police officers forcibly entered Williams' home without a warrant, woke her up, and took her children away. *See* Pl. Aff. ¶ 5. At that moment, Williams knew—or at the very least, should have known—of the alleged wrong. As such, Williams' claims predating March 25, 2010 are time-barred.

Given that, Williams' claims are time-barred to the extent she challenges the forcible entry into her house in December 2009, *id.* at ¶ 5, and the 2009 removals of her children, which she protests on the grounds that "children at home alone is not a crime or emergency in itself," *id.* at ¶ 6; *see also id.* at ¶ 3. These incidents appear to be the basis for most of Williams' Fourth Amendment claims. *See* Compl. ¶ 49. Accordingly, summary judgment is granted for defendants on Williams' claims that predate March 25, 2010.

### 3.   Absolute Immunity of ACS's Lawyers

Two defendants, Stephens and Sokol, are Special Assistant Corporation Counsels for the City of New York who represented ACS in the Family Court proceedings. Williams alleges that both attorneys "recommended that the children remain separated from each other and their mother on behalf of Defendant ACS caseworker Fredrick Savory and Defendant Yesenia Delvalle," Compl. ¶ 56, "favored the continued placement of the Plaintiff's daughter [Y.J.] with Gregory Johnson," *id.* at ¶ 62, and "favored the continued separation of the siblings which is in contrast to the NYS directives regarding placement of siblings," *id.* at ¶ 63.

Even taking these allegations as true, Williams' claims cannot proceed against Stephens and Sokol because they are entitled, as a matter of law, to absolute immunity. The Supreme Court has held that a state prosecutor is absolutely immune from liability in a § 1983 action for damages for his conduct "in initiating a prosecution and in presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). And "officials performing certain functions analogous to those of a prosecutor" may similarly "claim absolute immunity with respect to such acts." *Butz v. Economou*, 438 U.S. 478, 515–17 (1978). For an official who has absolute immunity, this immunity extends to all acts "closely associated with the conduct of litigation." *Barrett v. United States*, 798 F.2d 565, 571–72 (2d Cir. 1986).

The Second Circuit has applied this doctrine to facts virtually identical to those here.  In *Walden v. Wishengrad*, 745 F.2d 149 (2d Cir. 1984), it held that a municipal attorney who prosecutes child protective orders and represents the municipality's interests in Family Court was entitled to "absolute immunity from claims arising out of the performance of her duties."  *Id.* at 152.  Although "absolute immunity should be accorded only in exceptional cases," the Second Circuit reasoned that such immunity was merited there, because the duties of the attorney in that case were "similar to those of a prosecutor"; the interests that she represented were "similar in importance to the prosecutor's office's responsibilities"; there was a "need to pursue protective child litigation vigorously"; and the attorney's duties had the potential to lead to "subsequent colorable claims."  *Id.*  As a result, the attorney "must be allowed to perform her duties free from fear of potential lawsuits by individuals allegedly harmed by her actions," and the court affirmed the district court's grant of summary judgment for the municipal attorney because of her absolute immunity.  *Id.*  Relying on *Walden*, the Second Circuit similarly granted absolute immunity to attorneys employed by ACS who initiated child removal proceedings in family court accusing parents of child abuse.  *See Cornejo v. Bell*, 592 F.3d 121, 127–28 (2d Cir. 2010).  *Walden* and *Cornejo* are controlling here.  They require that summary judgment be granted on all claims against Stephens and Sokol.

### 4.   Supervisory Liability of ACS Commissioners and Chiefs of Staff

Williams has also sued four high-ranking ACS officials: former and current Commissioners Mattingly and Richter; and former and current chiefs of staff Hu and Lauros.  Summary judgment is merited for these defendants because Williams has not alleged facts indicating that they were personally involved in any alleged violations.

To state a § 1983 claim against an individual defendant, a plaintiff must allege sufficient facts to demonstrate that the defendant was personally and knowingly involved in violating her constitutional rights. *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06 Civ. 2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). Personal involvement in a § 1983 violation may be shown by evidence that the official: (1) participated directly in the violation; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who caused the unlawful condition or event; or (5) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Williams' Complaint lists the Commissioners and chiefs of staff as defendants, *see* Compl. ¶¶ 9, 11, but does not elaborate at all on their acts, except to say generally that the ACS Commissioner is responsible for ensuring ACS's compliance with the law and "for making and/or approving policies for ACS, including policies regarding the investigation of alleged child abuse or maltreatment, the removal and detention from their families, and the training and supervision of employees in ACS," *id.* at ¶ 10. In her deposition, Williams accused former Commissioner Mattingly of failing to "oversee his agency or his employees, adequately . . . because [Williams'] case was not handled correctly," Pl. Dep. 107–08; accused Richter of "fail[ing] to supervise his employees, and to ensure that the agency is acting in accordance with the law," *id.* at 119; accused Hu of failing to "make sure that her employees are acting according to their responsibilities and the law," *id.* at 109; and alleged that Lauros "has authority over A.C.S. employees, and ensuring that they follow guidelines and procedures, and based on what

happened with my most recent run-in with A.C.S. [in March 2013], it doesn't seem as though she's doing her job correctly," *id.* at 116–17.

Williams has adduced no facts to support these generalized claims of misfeasance, let alone that these officials were "personally or directly involved" in the alleged violations at issue here, as the law requires. *Harris*, 2008 WL 953616, at *9. The sole example of personal involvement on the part of these defendants is that Williams had a brief email exchange with Hu following the December 2009 incident. However, that email exchange occurred in January and early February 2010, *see* Kruk Decl. Ex. C (emails of Jan. 7, 2010; Feb 1, 2010; Feb 1, 2010; Feb. 4, 2010; Feb. 5, 2010; and Feb. 5, 2010), before the March 25, 2010 statute of limitations cut-off. There is, thus, no evidence that any of these officials participated in a violation of law, let alone that they participated within the three-year period preceding Williams' Complaint. And, even where the evidence is sufficient to support a verdict against underlings, a general or vague claim of supervisory lapses, such as Williams makes, is insufficient to support supervisory liability, absent specific factual allegations as to such personnel. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("mere 'linkage in the . . . chain of command' is insufficient to implicate a" supervisory official "in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). As a result, the Court grants summary judgment to the two commissioners and the two chiefs of staff.

### B.    Williams' Remaining Federal Claims

Williams' remaining federal claims consist of Fourteenth Amendment claims (due process and equal protection) against ACS caseworkers, their direct supervisors, the City of New York and the NYPD, and a Fourth Amendment claim of false arrest against ACS and the NYPD.

1.    **Overview of Constitutional Principles Relating to the State's Removal of Children from Their Homes**

"Parents . . . have a constitutionally protected liberty interest in the care, custody and management of their children." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999)).  As a result, the state's removal of a child from her parent can give rise to a variety of constitutional claims.  *See id.*

"First, both the parents and the children may have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process." *Id.*  The Fourteenth Amendment requires that, "except in emergency circumstances, judicial process must be accorded both parent and child before removal of the child from his or her parent's custody may be effected." *Id.* (citing *Kia P. v. McIntyre*, 235 F.3d 749, 759–60 (2d Cir. 2000); *Tenenbaum*, 193 F.3d at 593–94; *Duchesne v. Sugarman*, 566 F.2d 817, 825–26 (2d Cir. 1977)).  The emergency exception allows "government officials [to] remove a child from his or her parents' custody before a hearing is held where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent." *Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir. 1996).

"Second, a parent may also bring suit under a theory of violation of his or her right to substantive due process." *Southerland*, 680 F.3d at 142.  Parents have a "'substantive right under the Due Process Clause to remain together [with their children] without the coercive interference of the awesome power of the state.'  Such a claim can only be sustained if the removal of the child 'would have been prohibited by the Constitution even had the [parents] been given all the procedural protections to which they were entitled.'" *Id.* (quoting *Tenenbaum*, 193

F.3d at 600) (internal citations omitted).  Other constitutional provisions, including the Fourth

Amendment, may also be relevant depending on the particular facts of the case.  *Id.* at 143.

### 2.   Williams' Due Process Claims

I.W. was undisputedly removed from Williams' custody on March 19, 2013 without a

court order.  Because there was no pre-removal judicial process, the decisive issue is whether

there was "objectively reasonable" evidence that harm to the child was "imminent."  *Nicholson*

*v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003) (citations omitted).  On this motion for summary

judgment, viewing the evidence in the light most favorable to Williams, the issue is whether a

reasonable jury could find a lack of "objectively reasonable" evidence that harm to I.W. was

"imminent" at the time of the 2013 removal.

In reviewing the evidence, the Court notes that the summary judgment record contains

defendants' accounts of the events at issue, but not Williams'.  During her deposition, Williams

repeatedly invoked her Fifth Amendment right not to incriminate herself.  Pl. Dep. 80–82.  The

Fifth Amendment protects persons from being compelled to answer questions put to them "in

any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate

[them] in future criminal proceedings."  *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).  Although

Williams was entitled to invoke this right, *id.*, her invocation of it does not free her from her

burden of adducing evidence to defeat summary judgment.  A "litigant claiming the privilege is

not 'freed from adducing proof in support of a burden which would otherwise have been his.'"

*United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 83 (2d Cir. 1995) (quoting *United States v.*

*Rylander*, 460 U.S. 752, 758 (1983)).  Quite the contrary, an adverse inference may be drawn

"against parties to civil actions when they refuse to testify in response to probative evidence

offered against them."  *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir.

2012) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).  Thus, "the claim of privilege

will not prevent an adverse finding or even summary judgment if the litigant does not present

sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *Id.*  Here, similarly,

Williams' "decision to invoke the Fifth Amendment does not itself raise an issue of fact,

precluding the Court from granting summary judgment, if [defendants have] presented sufficient

evidence to support the motion." *Nissho Iwai Am. Corp. v. Siedler*, No. 94 Civ. 513 (DLC),

1995 WL 555699, at *1 (S.D.N.Y. Sept. 18, 1995).  Of course, on this motion, the Court must

construe the evidence that has been adduced in the light most favorable to Williams.

### a.     Events of March 2013

The events of March 2013 are canvassed in detail above.  *See supra*, pp. 11–16.  In short,

I.W. came to school on a Monday, told the principal she needed to speak with her ACS

caseworker, and wrote out that Williams had hit her with a belt multiple times the day before.  A

report was called in to the State Central Register, and caseworker Ellis was assigned the case.

Ellis visited Williams' home that evening, where Williams blamed the school for the report.

When Ellis and I.W. spoke privately in a bedroom, I.W. said that she did not want Ellis to reveal,

to Williams, that it was *I.W.* who had disclosed the incident.  I.W. added that she did not want to

speak, in the home, about the incident.  The next morning, Ellis visited I.W. at school, where

I.W. said that Williams had beaten her with a belt buckle for holding a Blackberry device; that

when that belt broke, Williams got another one and continued to beat I.W.; that I.W. received

welt marks on her arms when she tried to protect her legs from the beating of the belt; and that

after the beating, I.W. found it hard to walk.  Ellis observed "welt marks in the healing phase on

both of I.W.'s arms that were about three inches in length," as well as "lacerations on I.W.'s legs

and thighs that were also in the healing phase that appeared to be from the buckle of the belts."

Ellis Decl. ¶ 19.  I.W. told Ellis that this was not the first time her mother had hit her, but it was the most severe.  That afternoon, ACS asked Williams to bring I.W. to the 47th Precinct in the Bronx; there, I.W. repeated her account to NYPD Officer Rivera and Ellis.  Williams was arrested.  That day, I.W. was removed on an emergency basis after Awer obtained authorization.

### b.   Analysis

Turning first to Williams' procedural due process claim, due process requires that parents be afforded a hearing before a child is removed from their custody, unless there is "objectively reasonable" evidence that harm to the child was "imminent."  *Nicholson*, 344 F.3d at 171 (citing *Gottlieb*, 84 F.3d at 520; *Hurlman v. Rice*, 927 F.2d 74, 81 (2d Cir. 1991)).   Here, even viewing the evidence in the light most favorable to Williams, there was plainly "objectively reasonable" evidence known to ACS that harm to I.W. was "imminent," justifying her removal from Williams' home on an emergency basis, *i.e.*, without a court order.  *Id.*  In particular, ACS knew that: (1) I.W. lived with (only) Williams; (2) I.W. had reported to her school principal that Williams had beaten her at home the previous day; (3) I.W. specifically asked to speak with ACS caseworker Savory; (4) I.W. told both caseworker Ellis and Officer Rivera that Williams had beaten her with a belt buckle, and that when the first belt buckle broke, Williams continued the beating with a second belt buckle; (5) I.W.'s arms and legs were bruised, and the shapes of the bruises were consistent with belt-buckle beatings; (6) I.W. was in sufficient pain that she could not walk normally; (7) I.W.'s account of the facts was consistent across separate interviews; (8) I.W. reported that her mother had hit her previously, and that the prior day's beating was the most severe yet; and (9) I.W. was scared to discuss the incident in her mother's home and feared her mother's reprisal if her mother learned who had reported the alleged incident.  These facts raised obvious concerns about imminent further danger to I.W., and called into grave question

Williams' fitness as a guardian.  *See Nelligar v. Clark*, No. 10 Civ. 743 (KBF), 2012 U.S. Dist. LEXIS 176869, at *22 (S.D.N.Y. Dec. 7, 2012) (granting summary judgment to defendants where "plaintiff [did] not dispute the central assertions on which defendants rely for their summary judgment motion," and those assertions "suggest[ed] that there was an emergency situation requiring the removal of" plaintiff's minor child).

To be sure, at one point in her deposition, Williams said, "I never spanked [I.W.]."  Pl. Dep. 73.  But this statement does not call into question the information reported by I.W. to ACS, or observed by ACS, at the time it acted.  And this statement merits limited weight, given that Williams otherwise repeatedly invoked the Fifth Amendment, including in response to questions about the details that I.W. had reported (*e.g.*, about the belt-buckle beatings of I.W., about the use of a second belt to beat I.W., about the "no-electronics" punishment imposed on I.W. whose breach apparently prompted Williams to beat I.W., and about whether I.W. had a Blackberry in her hands).  Pl. Dep. 80–82.  On this record, there is no genuine issue of material fact:  It was plainly "objectively reasonable" to conclude that harm to the child was "imminent," obviating the need for prior court approval.  *Nicholson*, 344 F.3d at 171.  Indeed, in the Court's judgment, on the facts known to it, it would have been unreasonable for ACS to conclude otherwise.

In so holding, the Court rejects Williams' argument that, if harm were truly "imminent," ACS would have removed I.W. immediately rather than permit her to remain with Williams for one more night.  Pl. Aff. ¶ 21.  This argument proves too much; the fact that ACS conscientiously and quickly followed up—and in the process, ensured the accuracy of the report and the consistency of the child's statements—is a sign of care rather than a sign that the circumstances were not extremely serious.  The initial report to the State Central Register was called in on a Monday afternoon; by Tuesday afternoon, ACS had separate, consistent statements

from I.W. (to Ellis and Rivera) and had removed I.W. from Williams' custody on an emergency basis.  ACS's swift but thorough actions are what one would expect in response to "objectively reasonable" evidence that harm to the child was "imminent."  In sum, the Court enters summary judgment for defendants on Williams' procedural due process claim.

As to Williams' substantive due process claim, "[s]uch a claim can only be sustained if the removal of the child 'would have been prohibited by the Constitution even had the [parents] been given all the procedural protections to which they were entitled.'"  *Southerland*, 680 F.3d at 142 (quoting *Tenenbaum*, 193 F.3d at 600).  No such claim of a freestanding constitutional prohibition has been articulated, or is available to Williams, here.  Further, Williams received all the process to which she was entitled:  The emergency removal of I.W. was factually justified; and immediately thereafter, the Bronx Family Court held a number of post-removal hearings, which Williams was entitled to attend.[7]  Williams therefore has no substantive due process claim.

### 3.    Williams' Equal Protection Claim

Williams' Complaint fleetingly invoked her right to "equal protection of the laws," *see* Compl. ¶ 1, but Williams nowhere explains how this right was infringed.  She does not allege that she was subject to differential treatment based on membership in a protected class, *see generally Able v. United States*, 155 F.3d 628, 631–32 (2d Cir. 1998), nor does she overtly make a "class of one" argument.  However, because Williams is a *pro se* litigant, the Court construes her arguments in the most favorable light possible, and thereby construes Williams to make, implicitly, a class-of-one claim.

---

[7] Williams chose not to attend most of these hearings because, she explained in her deposition, she felt that these hearings were not "fair."  Pl. Dep. 61.  Her election not to attend the court hearings, however, does not give her a due process claim.

"A class-of-one claim exists 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  To succeed on a class-of-one claim, a plaintiff must establish that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Id.* (citation omitted).

The Court infers that Williams seeks to pursue a class-of-one claim, because her statements suggest she believes that she was singled out for harsh treatment.  *Cf. id.* at 137 (analyzing, under class-of-one doctrine, claims that New York State Department of Health "intentionally and maliciously subjected [plaintiff] to an intense and unwarranted degree of regulatory scrutiny").  Williams alleges that her children were removed "under circumstances that the agency would not remove other New York City parents['] children for," and that ACS "would not have removed the child of an affluent New Yorker based on the 2009 and 2013 allegations without the legally required efforts." Pl. Aff. ¶ 30; *cf.* Compl. ¶ 83.  However, she has not come forward with any evidence to support these assertions.  Nor has Williams provided any evidence of how "similarly situated" comparators were treated.  This prevents her from pursuing a class-of-one claim.  *See, e.g.*, *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001) (requiring class-of-one plaintiffs to prove "intentional disparate treatment," *i.e.*, to demonstrate that decisionmakers were aware of similarly situated individuals who were treated differently).

### 4.  Williams' Fourth Amendment Claim

Williams states that "ACS representatives lured [her] to a Bronx Police station" by threatening to remove her child, and then she "was subject to arrest and detention, a Bronx Criminal Court case, a new Bronx Family Court case, and her child was once again removed without a court order, an emergency situation present, reasonable efforts to prevent removal." Pl. Aff. ¶ 20.  The Court construes this statement to allege a false arrest claim against ACS and NYPD based on Williams' arrest on March 19, 2013.

"To prove the elements of false arrest under New York law, plaintiff must show: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).  A § 1983 claim for false arrest is premised on an individual's Fourth Amendment right to be free from unreasonable seizures, and "is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  The existence of probable cause to arrest "is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Id.* (citations and internal quotation marks omitted).

Here, the officers clearly had probable cause to arrest Williams, for the reasons set out above.  The assembled evidence, including I.W.'s specific accounts of abuse at Williams' hands and the defendants' visual observations of bruises on I.W.'s body in places consistent with I.W.'s narrative, *see, e.g.*, Defs' 56.1 ¶¶ 144, 150, supplied "reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.*  Thus, to the extent Williams brings a false arrest claim, summary judgment for defendants is granted.

### C.    Qualified Immunity

The Court has held that the ACS caseworkers and supervisors did not violate Williams'

constitutional rights.  However, even if the evidence could be viewed to suggest that these

officials had engaged in borderline conduct, these officials would still be protected by the

doctrine of qualified immunity, because they were all "acting in discharge of their duties and

within the scope of their employment."  N.Y. Soc. Serv. Law § 419.  "The qualified-immunity

doctrine shields 'government officials performing discretionary functions . . . from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  *X-Men Sec., Inc. v.*

*Pataki*, 196 F.3d 56, 65 (2d Cir. 1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Qualified immunity therefore presents an additional ground on which these defendants could

have prevailed, because a plaintiff must demonstrate not only that a constitutional violation

occurred, but also that the right at issue was clearly established at the time of the alleged

conduct.  *Id.* at 65–66.  As an alternative holding, the Court finds that the doctrine of qualified

immunity also bars Williams' claims against the ACS caseworkers and their supervisors.

### D.    Municipal Liability

Because the Court has not found any violations of Williams' constitutional rights, there is

no basis on which she can pursue a theory of municipal liability.  *See Segal v. City of New York*,

459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the

failure by the government to train its employees; it *extends* liability to a municipal organization

where that organization's failure to train, or the policies or customs that it has sanctioned, led to

an independent constitutional violation." (citing *Monell v. Dep't of Social Servs. of N.Y.*, 436

U.S. 658, 694 (1978))).  But even if the events involving her children had given rise to a

violation of her rights, summary judgment for the City would still be proper.  Williams'

Complaint alleged a City policy of unconstitutionally removing children from parents' homes,

enlisting the NYPD to forcefully and unlawfully gain entry into the homes of families under

investigation, and removing children unlawfully.  But Williams has not adduced any evidence to

support these allegations.  As a result, there is simply no proof of an "official policy," *Anthony v.

City of New York*, 339 F.3d 129, 139 (2d Cir. 2003), a "custom," *Patterson v. County of Oneida*,

375 F.3d 206, 226 (2d Cir. 2004), a "pattern of misconduct," *Reynolds v. Giuliani*, 506 F.3d 183,

192 (2d Cir. 2007), or "deliberate indifference," *Cash v. County of Erie*, 654 F.3d 324, 334 (2d

Cir. 2011).  For this reason, too, summary judgment for the City is appropriate.[8]

---

[8] In granting defendants summary judgment on all federal claims, the Court has also rejected
multiple, miscellaneous undeveloped contentions in Williams' Complaint and Affidavit.  For
instance, Williams "disputes the authenticity" of the March 20, 2013 Court order (Ellis Decl. Ex.
G.) in which Judge Pitchal excused ACS from making reasonable efforts to avoid the removal of
I.W. because, he found, it would have been contrary to I.W.'s welfare and best interests to
remain with Williams.  Pl. Aff. ¶ 21.  At summary judgment, however, merely *stating* that one
disputes the authenticity of the opposing party's evidence is insufficient to produce a genuine
issue of material fact; evidence is required.  *See Anderson*, 477 U.S. at 249 ("[T]here is no issue
for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a
verdict for that party.").  The same is true for Williams' fleeting, unexplained allegation that
defendants provided "false information with regards to the role of ACS."  Compl. ¶ 64.  Finally,
Williams unpersuasively argues that her child I.W.'s statements to ACS are inadmissible
hearsay.  Pl. Aff. ¶ 26.  I.W.'s statements would be admissible for two reasons.  First, her reports
of abuse may be largely considered for the truth of the matter asserted by I.W., because they
concerned her then-existing mental, emotional, or physical condition.  *See* Fed. R. Evid. 803(3).
Second, all of I.W.'s statements may be considered to the extent they reflected on defendants'
state of mind in determining to remove her from Williams' custody.

### E.    Williams' State-Law Claims

Having granted summary judgment to defendants on all federal claims, the Court declines

to exercise supplemental jurisdiction over Williams' state-law claims.[9]  *See generally* 28 U.S.C.

§ 1367(c)(3); *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172 (1997).

**CONCLUSION**

For the foregoing reasons, the Court grants summary judgment to the defendants on all

claims.  The Clerk of Court is directed to terminate all pending motions and to close this case.


SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: January 7, 2015
        New York, New York

---

[9] Williams' Complaint refers in passing to state-law claims, *see* Compl. ¶ 1 (referring to "the
New York State Constitution"), but does not specify which of her state-law rights were violated.